# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| RICHARD L. KAMMEN,<br>　　　　　Petitioner,<br><br>　　v.<br><br>GEN. JAMES N. MATTIS<br>in his official capacity as SECRETARY<br>OF DEFENSE, and<br><br>HARVEY RISHIKOF,<br>in his official capacity as CONVENING<br>AUTHORITY, DEPARTMENT OF<br>DEFENSE, OFFICE OF MILITARY<br>COMISSIONS, and<br><br>COL. VANCE H. SPATH (AIR FORCE),<br>in his official capacity as MILITARY<br>JUDGE, MILITARY COMMISSIONS<br>TRIAL JUDICIARY, DEPARTMENT OF<br>DEFENSE, and<br><br>　　　　　Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)  No.1:17-cv-03951-TWP-DML<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PETITION FOR WRIT OF HABEAS CORPUS
## AND MOTION FOR DECLARATORY JUDGMENT

Petitioner Richard Kammen, seeks a writ of *habeas corpus* and Order of Declaratory Judgment, to prohibit his unlawful detention. Petitioner, a United States citizen, is under direct order by Col. Vance H. Spath, a military judge who is presiding over a Military Commission at Guantanamo Bay, to appear as counsel on Friday, November 3, 2017, in contravention of his rights. If Petitioner does not appear, he will be arrested and held in contempt by Col. Spath. Petitioner has not been charged with a crime and Col. Spath lacks statutory authority to order his appearance under these circumstances.

## INTRODUCTION

Since 2008, Petitioner Richard Kammen has been retained as Learned Counsel for the defendant in *United States v. Abd Al-Rahim Hussein Muhammed Abdu Al-Nashiri*, a capital case being tried before a military tribunal in Guantanamo Bay. Over the course of Mr. Kammen's representation of Mr. Al-Nashiri, the government has repeatedly interfered with attorney-client communications, intruded into the attorney-client relationship, monitored and infiltrated defense teams without disclosure. Believing his representation to have been ethically compromised, Mr. Kammen sought advice from experts in legal ethics and, ultimately, requested release from Mr. Al-Nashiri's case.

Chief Defense Counsel for Military Commissions, Brigadier General John Baker, USMC, excused Learned Counsel for good cause.

Nullifying Chief Defense Counsel's careful review and excusal, Col. Spath now compels by order Mr. Kammen's appearance and continued legal representation of Mr. Al-Nashiri in violation of Mr. Kammen's ethical and professional obligations as an attorney.

There is no legal basis or authority under which Respondents may hold Mr. Kammen. Custody of Mr. Kammen violates "the Constitution or laws or treaties of the United States," and is a violation of 18 U.S.C. § 4001(a) ("Non-Detention Act"). This Court should issue a writ of habeas corpus and should grant Mr. Kammen's request for declaratory relief specifying that the Military Commission headed by Col. Spath has no jurisdiction over Mr. Kammen, a private citizen.

2

## JURISDICTION & VENUE

1.  Petitioner brings this action pursuant to 28 U.S.C. §§ 2241 and 2242.  This Court has jurisdiction over the subject-matter pursuant to 10 U.S.C. § 950p(c), 28 U.S.C. §§ 1331, 2201, the Fifth Amendment, the Sixth Amendment and the Eighth Amendment.

2.  This Court has statutory authority under 28 U.S.C. § 2241 to grant the writ of *habeas corpus*. Mr., Kammen, under direct order to appear by Col. Spath, is currently in custody for purposes of § 2241[1]. Pursuant to 28 U.S.C § 2201, this Court has authority to declare the rights and other legal relations of the parties herein. Pursuant to 28 U.S.C. §§ 1651 and 2202, and 2201, this Court has the authority to effectuate and enforce its judgments by all necessary and proper means, as this case involves an actual controversy within the Court's jurisdiction.

3.  Venue is proper in the Southern District of Indiana, since the Petitioner is located in the district. 28 U.S.C. § 1391(e).

## PARTIES

4.  Petitioner, Richard Kammen, is a citizen of the United States and a civilian lawyer holding an unlimited license to practice law in Indiana. Since 2008, he has served as Learned Counsel for Mr. Al-Nashiri in a capital case pending before a military tribunal in Guantanamo Bay.

---

[1] The in custody requirement for habeas does not require physical custody. *Hensley v. Municipal Court, San Jose-Milpitas Judicial Dist.*, 411 U.S. 345, 351 (1973)(parolee subject to orders to appear and criminal violation for failing to do so, is "in custody" for purposes of habeas statute.) Custody simply requires a "severe restraint" on liberty, which means "one not shared by the public generally." *Jones v. Cunningham*, 371 U.S. 236, 240 (1963). One court has even held that an order of community service constitutes "custody" for purposes of habeas. *Barry v. Bergen Cty. Prob. Dep't*, 128 F.3d 152, 154 (3rd Cir. 1997). Mr. Kammen has been ordered to appear by Col. Spath before a military commission in either Alexandria, Virginia or Guantanamo Bay, Cuba. He has been told that his disobedience may result in a criminal offense by means of a finding of contempt and subsequent punishment. Mr. Kammen is subject to severe restraints on his liberty not shared by the public generally.

5.  Respondent, Col. Vance Spath, USAF, is a citizen of the United States and presently serves as the military commission judge in the case of *United States v. Al-Nashiri*. In that role, he refused to recognize Chief Defense Counsel for Military Commissions Brig. Gen. John Baker's excusal of Mr. Kammen from the *Al-Nashiri* case, despite the fact that Brig. Gen. Baker followed proper procedures and made a good cause determination. Following Mr. Kammen's subsequent refusal to appear for a scheduled hearing, Col. Spath issued a writ of attachment that serves as the basis for Mr. Kammen's current detention and confinement.

6.  Respondent, Harvey Rishikof, is a citizen of the United States and presently serves as the Convening Authority for the Office of Military Commissions. In that role, he is responsible for convening military commissions and managing their day-to-day operations. Mr. Rishikof is empowered by statute and regulation to rescind orders issued by his predecessors. His primary place of business is the Defense Pentagon in Washington, D.C.

7.  Respondent, James Mattis, is a citizen of the United States and presently serves as the Secretary of Defense. Under federal law, he is delegated the authority to supervise the conduct of military commissions convened under the Military Commissions Act of 2009 and to appoint and supervise the Convening Authority for the Office of Military Commissions. His primary place of business is the Defense Pentagon in Washington, D.C.

## RELATED CASES

8.  In a prior proceeding in this case, Respondent Col. Spath ordered defense witness LCDR Stephen D. Gill, USNR, to appear for redirect examination. When Gill

4

defied Col. Spath's order to appear, Col. Spath signed a warrant of attachment and, upon information and belief, directed Assistant United States Attorney Mark Miller, who is detailed by the DOJ to the military commissions, to request that the United States Marshal's Service retrieve Gill from his home in Massachusetts and transport him to Virginia where he was required to testify by videoconference. At the time, while discussing the military commission's authority to compel a witness, Miller said, "I think we all agree that we cannot force somebody to come to the island."[2]

## STATEMENT OF FACTS

9.      Abd al Rahim Hussein Muhammad Abdu Al-Nashiri is a detainee in the U.S. Naval Station, Guantanamo Bay. Mr. Al-Nashiri was taken into custody in October 2002 in Dubai, United Arab Emirates.  According to the Senate Select Committee on Intelligence's "Torture Report" he was held in five secret CIA overseas prisons, including one in Guantanamo Bay, Cuba, until he was brought back to Guantanamo in September 2006.[3] Mr. Al-Nashiri is charged with multiple offenses under the Military Commissions Act of 2009 ("MCA"), 10 USC §§ 948 *et. seq*. The charges against Mr. Al-Nashiri were referred for capital prosecution.  Once the death penalty was invoked, Mr. Al-Nashiri was entitled to the appointment of counsel learned in the law of capital cases ("Learned Counsel").  10 USC § 949a(b)(2)(C)(ii) and R.M.C. 506(b).  Richard Kammen, a well-respected veteran of both Indiana and Federal courts, was appointed to serve as

---

[2] http://www.miamiherald.com/news/nation-world/world/americas/guantanamo/article180485996.html
[3] *USS Cole bombing trial guide*, Miami Herald, September 5, 2016; See: http://www.miamiherald.com/news/nation-world/world/americas/guantanamo/article100104397.html (last visited October 24, 2017).

Learned Counsel. Mr. Kammen has served as Learned Counsel in over thirty federal capital cases, several of which have been tried to verdict.

10. After learning that the government had repeatedly interfered with his attorney-client communications, intruded into the attorney-client relationship, monitored and infiltrated defense teams without disclosure and believing his representation of Mr. Al-Nashiri to have been irreparably ethically compromised, Mr. Kammen sought advice from Professor Ellen Yaroshefsky, a renowned expert in legal ethics.

11. Professor Yaroshefsky is the Howard Lichtenstein Distinguished Professor of Legal Ethics and Executive Director of the Monroe Freedman Institute for the Study of Legal Ethics at Hofstra University School of Law. Prof. Yaroshefsky relied upon unclassified facts that were provided to her as set forth in the fact sheet attached to her Opinion Letter. [Exhibit A] Additionally, Prof. Yaroshfsky's legal analysis utilized the Indiana Rules of Conduct to which Mr. Kammen is subject as a member of the Indiana Bar, the Model Rules of Professional Conduct, which govern lawyers in the various branches of the United States Military, and national ethics opinions and case law.

12. Prof. Yaroshefsky concluded that Mr. Kammen's continued representation of Mr. Al-Nashiri in this matter would be unethical:

> You cannot, consistent with your ethical obligation continue to represent Mr. Nashiri.  Rule 1.16(a)(1) of Professional Conduct mandates that you withdraw from representation.  It provides that a lawyer "shall withdraw from representation of a client if the representation involves a violation of the rules of professional conduct or other law."  You are required to withdraw as his counsel because continued representation will result in a violation of IRPCs and MRPCs 1.1, 1.3. 1.4 and 1.6.

Exhibit A, pg. 7.

13.     On October 6, 2017, Mr. Kammen sought permission to withdraw from

representation of Mr. Al-Nashiri on the grounds that his continued involvement in this

case violated the ethical rules to which he is subject as a member of the Bar of the

State of Indiana.  [Exhibit B] The relevant rule for excusal provides:

> After an attorney-client relationship has been formed
> between the accused and detailed defense counsel ..., an
> authority competent to detail such counsel may excuse or
> change such counsel only: (i) Upon request of the accused
> or application for withdrawal by such counsel; or (ii) For
> other good cause shown on the record.

Rule for Military Commission (R.M.C.) 505(d)(2).

14.     On October 11, 2017, Brigadier General John G. Baker, the Chief Defense

Counsel for Military Commissions, excused Mr. Kammen as defense counsel[4] and

directed him to file a written "notice" of excusal with the military judge.  [Exhibit C] Brig.

Gen. Baker's excusal was based upon the "good cause" provision of R.M.C. 505(d)(2),

quoted above.  In reaching his conclusion, Brig. Gen. Baker relied upon Mr. Kammen's

request to withdraw as Learned Counsel, including Prof. Yaroshefsky's opinion, as well

as, "all of the information I know about this matter – *both classified and unclassified*".

Exhibit C [*emphasis added*].

15.     Additional authority for Brig. Gen. Baker's exclusive power to remove counsel,

in his capacity as Chief Defense Counsel for Military Commissions, is discussed at

length below.  For purposes here, it is important to note the source and his appointment

and authority to act as Chief Defense Counsel.

---

[4] The two other civilian defense lawyers were also excused.  Their status is not part of this action.

a. Congress established the office of the Chief Defense Counsel.  10 U.S.C. § 948(q).

b. The Chief Defense Counsel is a general officer nominated and appointed by the President following confirmation by the Senate, 161 Cong. Rec. S4554, 4555 (daily ed., June 23, 2015), after being selected for that office by a joint selection board.  See, Under Secretary of Defense Memorandum of Instruction 20141216 (convening of selection board).

c. Among military commission actors, only the Chief Prosecutor holds the same grade and is similarly given a constitutional appointment to office. The Chief Prosecutor, like Chief Defense Counsel, is granted the authority to act as the sole excusal authority for those counsel who work under his/her supervision.

d. Brig. Gen. Baker has served in various capacities during his career as a Marine JAG. He has prosecuted and defended courts martial. He served as the Staff Judge Advocate for then-Marine Corps Commandant Gen. James Mattis, now-Secretary of Defense.

16.    Mr. Kammen filed the written notice of his excusal on October 13, 2017. On the same day, Mr. Al-Nashiri, through his sole remaining military counsel, moved to abate the proceedings until new Learned Counsel could be located.  [Exhibit D] Appointment of new Learned Counsel would also require that the conditions causing Mr. Kammen's excusal be remedied, as any new lawyer would necessarily labor under the same ethical constraints that required Mr. Kammen's excusal.

8

17.    On October 16, 2017, Respondent, Col. Spath, issued a "Briefing Order". [Exhibit E] Without elaboration, he said that the Commission had not found "good cause" to excuse civilian defense counsel, including Mr. Kammen, and directed civilian defense counsel to be present at the United States Naval Base in Guantanamo, Cuba for scheduled hearings from October 30, 2017 through November 17, 2017.  Col. Spath also ordered expedited briefing on the motion to abate.

18.    On October 20, 2017, the government filed its response, objecting to the motion to abate. [Exhibit F] In the government's view, there was no reason to abate the proceedings because Mr. Kammen and his colleagues had no "good cause" for excusal and, therefore, Mr. Kammen remained counsel for Mr. Al-Nashiri.

19.    On October 24, 2017, the Chief Defense Counsel for Military Commissions filed a response on the issue of his authority to excuse Learned Counsel and other civilian counsel [Exhibit G] and on October 26, 2017 he filed a response to the government's reply to the motion to abate. [Exhibit H] Brig. Gen. Baker explained that his power to excuse counsel for "good cause" is unilateral and unreviewable under the amended rules promulgated by the Secretary of Defense in 2011.  This issue is discussed in further detail below.

20.    On October 27, 2017, Respondent, Col. Spath, issued an Order denying the motion to abate. [Exhibit I] The Order did not contest Brig. Gen. Baker's excusal of Mr. Kammen and did not purport to vacate Brig. Gen. Baker's order of excusal, but did assert that he had the authority to override Brig. Gen. Baker's finding. Moreover, Col. Spath stated that the defense had presented no evidence of intrusion warranting

9

excusal for good cause.  This statement was false and an examination of the classified evidence would demonstrate that it is false.

21.  On October 30, 2017, Mr. Kammen and the two other civilian lawyers did not appear for scheduled hearings in Mr. Al-Nashiri's case in Guantanamo Bay.  The court directed the parties to file briefs by noon detailing lawful next steps.

22.  On October 30, 2017, the government filed its brief.  Exhibit J, attached hereto. There, the government laid out a road map of what should occur that included holding a hearing, making fact findings, ordering Brig. Gen. Baker to testify, ordering Brig. Gen. Baker to countermand his own orders, and holding him in contempt if he failed to do any of these things. It also suggested the military judge should order the civilian lawyers, including Mr. Kammen, to testify via video from Virginia, and if they failed to do so, find them in contempt.

23. On October 31, 2017, court was convened and the absence of Mr. Kammen and the other two civilian defense attorneys was noted for the record.  The transcript of this hearing is attached as Exhibit K.  The court made record of the findings of fact which he deemed relevant to both the issues surrounding civilian counsel's absences and the expected testimony of Brig. Gen. Baker.  Exhibit K, pp. 10020-10027.  The court noted these findings were found "at least by a preponderance of the evidence."  Exhibit K, pg. 10020.

24. The court attempted to call Brig. Gen. Baker to testify.   Mr. Sundel, present as Acting General Counsel for the Military Commissions Defense Organization, asserted Brig. Gen. Baker's privilege not to testify pursuant to Rule 501 (b)(1).  The privileges claimed by Brig. Gen. Baker were "the deliberative process privilege, which is a

common law privilege; the government information privilege under 506; the attorney-client privilege under 502; the attorney work product privilege under common law; and additionally my obligation under my state ethics rules to protect confidential information under Rule 1.6." Exhibit K, pp. 10039-100040.

25. The court found Brig. Gen. Baker had to invoke privilege for each individual question propounded. Exhibit K, pg. 10029. Brig. Gen. Baker refused to be a witness. Mr. Sundel explained if the privilege were wrongfully pierced by the court there would be irrevocable harm. Exhibit K, pg. 10032. He also explained that the Model Rules of Professional Responsibility require an attorney to pursue vehicles to challenge an order to pierce a privilege unless and until the highest available court decides the issue or declines to hear it. Exhibit K, pg. 10033. Brig. Gen. Baker sought to take an appeal before being required to testify but the court said, "[t]hat is not one of the options." Exhibit K, pg. 10031. After much back and forth, Brig. Gen. Baker did not testify.

26. The court also directed Brig. Gen. Baker to "rescind the direction you gave when you excused both learned outside – appointed learned counsel and the two civilians." Exhibit K, pg. 1042. The court order Brig. Gen. Baker "to send them a memo telling them their withdrawal is not approved because you don't have the authority." Brig. Gen. Baker declined to do this. Brig. Gen. Baker and another military lawyer were directed to return the following day for contempt hearings.

27. On November 1, 2017 contempt proceedings were undertaken. The transcript of these proceedings are attached as Exhibit L. Brig. Gen. Baker attempted to defend himself and make a record, including arguing the military judge had no jurisdiction over him, but the military judge would not allow it. The military judge repeatedly told him to

sit down and not speak.  When Brig. Gen. Baker "request[ed] to be heard", the judge

threatened to have him removed.  Exhibit L, pg. 10055.  Later the military judge said,

"I'm denying you the opportunity to be heard."  Exhibit L, pg. 10054.  The military judge

expressed his frustration that some "might think this is fun or lighthearted".  Exhibit L,

pg. 10054.  He indicated he had "heard commentary out around the base.  Alls (sic)

you've got to do is get on the Internet."  Exhibit L, pg. 10054.  It is unclear to what he

refers.  All parties to this action, including Brig. Gen. Baker, have been nothing but

respectful to the military judge in these proceedings.  The suggestion that any of the

parties view this as "fun or lighthearted" could not be further from the truth.

28. At the conclusion of the contempt proceedings the military judge found Brig. Gen.

Baker in contempt for willfully disobeying his order to rescind his excusal of civilian

defense counsel and for refusing to testify on multiple occasions in his presence.  The

military judge found beyond a reasonable doubt that these acts disturbed the

proceedings.  Brig. Gen. Baker was sentenced to 21 days confinement to his quarters

and a $1000 fine.[5]

29. Later that day the military judge issued a written order directing civilian counsel,

including Mr. Kammen, to appear at the Marks Center in Alexandria, Virginia to continue

their representation of Mr. Al-Nashiri through videoconference.[6]  The Order is attached

---

[5] The judge declined to find Mr. Sutton in contempt.  The judge did, however, note that he failed to notify the commission of his appearance and did not file a request to be heard as a third party.  Additionally, Mr. Sutton "managed to refer to me as "Colonel" throughout the process despite my title clearly as "The Commission" or "Your Honor" or "Judge" or anything else indicating you respect that you're in a courtroom."  Exhibit M, pg. 10066.  This, the military judge said "made a mockery of the rules that apply to appearing before the commission".  The military judge said this was "disappointing, concerning conduct", but not contemptuous because when directed to stop speaking Mr. Sutton did so.
[6] Earlier that same day the military judge stated in open court that he was ordering counsel to the Virginia location on Monday November 6th where they would be permitted to "present arguments as to why they should be released from the representation of the accused different than the arguments I've already heard."  Exhibit M, pg. 10065.  The written order moved the date up to Friday November 3rd and

here as Exhibit M. Given the history of what has occurred here, the Order remarkably says "[t]his location will provide counsel with the capability to participate in the hearing as well as confer with their client discreetly thorugh secure terminal equipment."

30. The November 1st Order clearly and unequivocally states, "Failure to comply with this order may constitute contempt upon these proceedings as well as another voluntary absence by counsel of record." Exhibit M, pg. 2.

31. At core, the ethical problem in this case is that the government's monitoring of all methods of attorney communication between Mr. Kammen and his client put counsel in the ethically untenable position of being unable to assure that the communications between attorney and client are confidential. See, Ind. R. Prof. Cond. 1.6 (duty to maintain confidentiality of client communications). If counsel cannot confidentially communicate with his client, he cannot communicate with him at all which is a violation of Ind. R. Prof. Cond. 1.4 (duty to keep client reasonably informed about the status of the matter). Under these circumstances counsel is *required*, not just permitted, to withdraw. See Exhibit A.

32. The context in which the current issue arises reveals ongoing governmental interference in the attorney client relationship between Mr. Kammen and Mr. Al-Nashiri. Much of the information that immediately supports Brig. Gen. Baker's decision to excuse Mr. Kammen is classified.[7] But some of it is not and the picture that the unclassified information paints of justice in death penalty cases prosecuted at

---

was silent as to making arguments regarding why they are no longer counsel, or should be removed as counsel, to Mr. Al-Nashiri.
[7] Counsel for Petitioner have not had access to classified information relating to this matter. Everything contained in this filing is non-classified. Needless to say, this has compromised counsels' representation of Petitioner. It, likewise, impedes the Court's ability to resolve the issues contained herein.

Guantanamo Bay reveals a stunning, systemic, and fundamental disregard both for the right to counsel and for fairness at its most basic level. Because the conduct by government actors prevented Mr. Kammen from meeting his ethical responsibilities to his client, the Indiana Rules of Professional Conduct to which he is bound required his withdrawal from Mr. Al-Nashiri's defense. Accordingly, he was excused by Brig. Gen. Baker via the process for excusal that the Secretary of Defense proscribed in 2011.

33.   Ongoing government interference in the attorney client relationship involved, but was not limited to the following.

a.   <u>Interference with attorney-client telephone contact</u>.

In 2011, prison authorities at Guantanamo Bay prohibited all telephone communication between defense counsel and their clients. This was challenged by defense counsel but the prohibition was upheld.  This, in combination with the mail issues noted below, requires that all communication between lawyer and client be in person at the Naval Base in Guantanamo Bay, Cuba.

b.   <u>Interference with attorney-client contact by mail</u>.  Communicating with Mr. Al-Nashiri via letter has been fraught with confidentiality problems.

(1)   In October of 2011, guards confiscated privileged legal materials from the detainees' cells.  The Legal Department at the Naval Base read counsels' correspondence to their clients. Counsel complained about the intrusion.

(2)   In November 2011, defense counsel again complained to the Deputy Secretary of the Defense for Detainee Affairs about violations of privileged attorney client communications and requested that they cease.  Presciently, counsel predicted

that "The review and censorship of legal materials will effectively grind litigation to a halt by barring legally required attorney-client communications."[8]

(3)     In December 2011, the Commander of Joint Task Force ("JTF") – Guantanamo issued orders requiring military officials to review all legal correspondence between defense counsel and their clients.  Counsel who did not agree would not be permitted to visit their clients.

(4)     In January 2012, the Chief Defense Counsel issued an ethics instruction prohibiting defense counsel from using the Guantanamo legal mail system for privileged communications because they cannot adequately safeguard attorney client privileged communications.  Defense counsel were unable to exchange confidential written communications with their client for almost two years.  It was not until November 2013, that the military commissions in US v. Mohammad et. al. issued an order regarding the management of privileged written communications.

c.     Interference with privileged work product.  Privileged work product has also been the subject of governmental intrusion.

(1)     In March 2013, defense counsel discovered, through a series of IT related failures, that some unknown amount of privileged work product had been disclosed to the prosecution, IT personnel not bound by non-disclosure agreements, and other unknown entities.  The failures demonstrated that despite its privileged nature, defense counsels' computer data was not segregated or treated differently than data belonging to other computer system users.

---

[8] Letter from Counsel for High-Value Detainees to Deputy Secretary of Defense for Detainee Affairs, Subject: Request to Cease and Desist On-Going Attorney-Client Privilege Violations and For Compliance with Domestic and International Law Standards Regarding Detention Conditions, 1 November 2011 available at:  http://media.miamiherald.com/smedia/2011/11/01/17/45/10ijo.So.56.pdf.

(2)     At this same time, it was discovered that despite assurances to the contrary, active monitoring of defense internet usage is not conducted differently than for other system users.  IT technicians outside Military Commissions Defense Organization were allowed to monitor defense counsel online.  This failure was revealed when a defense team member opened a webpage and immediately received a phone call from an unknown IT technician about sidebar content.

(3)     A huge number of defense computer files unaccountably disappeared from network systems, including materials as highly sensitive as letters between counsel and their clients.  Files from defense counsel are unaccountably placed in other organizations' computer folders.  Some defense team members were unable to access their files or edit shared files.  The situation worsened over time.

(4)     Following broad searches of archived electronic communications on behalf of the prosecution, IT technicians sent the prosecution what may have been hundreds of thousands of internal defense emails.  The Chief Prosecutor guaranteed that "[a]t no time did any prosecutor actually view the content of any privileged defense communications.

(5)     In April of 2013, in light of the above breaches, the Chief Defense Counsel determined defense counsel could not adequately safeguard attorney client privileged communications.  The Chief Defense Counsel issued an ethics instruction prohibiting defense counsel from using Defense Department computer networks, including email, to transmit privileged or confidential information.  Efforts to mitigate the risk of improper disclosure more than tripled the amount of time necessary to draft and file pleadings.

(6)     Also in April 2013, the military judge in Mr. Al-Nashiri's case abated the proceedings for two months due to the government intrusions into defense emails.[9]

(7)     After receiving no response to thirteen (13) letters addressed to the Deputy Assistant Secretary of Defense for Rule of Law and Detainee Policy, defense counsel wrote directly to the Secretary of Defense seeking to address, *inter alia*, the systemic seizure of attorney client privileged materials.  Counsel asked the Secretary of Defense to cease the daily searches of legal bins and "order an immediate investigation into the identity of the persons responsible for ordering these seizures of attorney client privileged materials as well as the purpose for the seizures."[10]

d.     Interference with the attorney client privilege by attempted infiltration of defense teams. The government has also attempted to infiltrate the detainees' defense teams.

(1)     In April of 2014, two FBI agents recruited a civilian member of one of the detainees' defense team to act as a confidential informant.  The civilian defense team member was interrogated about purported wrongdoing by all the defense teams representing the detainees.  The defense team member was suspended and the lawyers had to question each of their own team members as to whether the team member had been contacted by federal agents and questioned about activities of the defense team under secret agreements with the FBI.[11]

---

[9] *Guantanamo dogged by new controversy after mishandling of e-mails*, Washington Post, April 11, 2013, See: https://www.washingtonpost.com/national/guantanamo-dogged-by-new-controversy-after-mishandling-of-e-mails/2013/04/11/1973bf9a-a2dd-11e2-82bc-511538ae90a4_story.html?utm_term=.75790217def8 (last viewed October 27, 2017)
[10] Joint Defense Letter to Secretary Hagel (May 20, 2013).
[11] *Accusation of FBI spying stalls 9/11 hearing*, Miami Herald, April 14, 2014, See http://www.miamiherald.com/news/nation-world/world/americas/article1962835.html (last viewed October 25, 2017).

(2)     The following year, court proceedings were called to a halt because the detainees recognized a court translator assigned to the defense as a CIA agent who had worked at the "black site" where they had been tortured.  The interpreter was a replacement for a previous defense translator after an FBI investigation secretly questioned defense team members.  Court was halted upon the discovery.  When court resumed, the linguist was no longer in the courtroom.[12]

e.     Interference with attorney-client face-to-face meetings.

(1)     Travel to Guantanamo Bay is onerous.  There is one commercial flight out of Ft. Lauderdale and military "Commissions flights" that are chartered by the Office of the Military Commissions. There is also a periodic "rotator flight" from NAS Jacksonville to Guantanamo.  There is no daily flight into Guantanamo Bay.  The military flights may be scheduled, but cancelled, if the load is not enough to justify the flight.  Due to the vagaries of flight schedules, every time Mr. Kammen goes to Guantanamo Bay to meet his client, he spends three or four days traveling.  If his business at the Naval Base is completed before the next flight (which may be days after his work is done), he is required to remain until the flight leaves.

(2)     Because Cuba is a foreign country, customs must be passed each time Mr. Kammen travels there. He is required to have a country clearance issued by the military as well as specific approval to enter the base. He must have a valid passport to travel to Guantanamo. This is true even when flying on the military commissioned

---

[12] Guantanamo hearing halted by supposed CIA "black site" worker serving as war court linguist, Miami Herald, February 9, 2015, See, http://www.miamiherald.com/news/nation-world/world/americas/guantanamo/article9600110.html (last viewed October 25, 2017).

flights. Upon return to the United States all people on the flight must "clear customs." Clearing customs can take hours, thus adding even more time to each trip.

      f.    <u>The government has repeatedly interfered with the confidentiality of attorney-client meetings</u>. Mr. Al-Nashiri's inability to meet with his lawyers confidentially has made representation difficult for both attorney and client.  Mr. Al-Nashiri, through counsel, has repeatedly been assured that his visits are not being monitored, only to discover later that they are.  These conditions make it impossible for the client to trust the confidentiality of what he tells his lawyers.  The problem is exacerbated in Mr. Al-Nashiri's case because of language and cultural barriers to trust, as well as the drumbeat of political rhetoric and policy concerning Arabs and Muslims.

      (1)    As early as 2012, confidentiality concerns began to appear regarding the interview rooms at the Naval Base.  In January 2012, JTF-GTMO's chief staff attorney reportedly discovered the rooms in which defense counsel had been meeting with their clients for years were wired with microphones that look like smoke detectors.  The chief of the guard force reportedly assured staff counsel that nobody at Guantanamo was turning on the microphones to listen in on privileged attorney client meetings.  But the prison camp commander was reportedly unaware of this discovery.  Defense counsel was not notified.

      (2)    In March 2012, in apparent contradiction of the discovery concerning the "smoke detectors", the prison camp commander wrote to Southern Command and advised that "no microphones are installed" in attorney client meeting rooms "to ensure privacy between the attorney and client is maintained."

(3)     In May 2012, at arraignment in *United States v. Mohammad, et. al.*, defense counsel informed the court they were unable to confidentially communicate with their clients during the period when the government was deciding whether to pursue the death penalty.

(4)     In January 2013, an unknown government entity was able to silence the courtroom audio feed.  The act is tantamount to censoring the proceedings, a function reserved for the military judge.  It was also discovered that courtroom microphones could capture confidential conversations between counsel and client even when the microphone is purposely muted by counsel.

(5)     In February 2013, the commander of the detention camp acknowledged under oath that he had known for more than a year that several attorney client meeting rooms contained cameras and dummy smoke detectors serving as listening devices. The government argued in court that there was no effort to conceal the devices, and their purpose was clearly labeled.  The military judge "looked at the picture of the microphone in an ECHO II room and concur[red] that, with casual observation, it [could] be mistaken for a fire alarm."[13]

(6)     In August 2013, the military judge in Mr. Al-Nashiri's case, over defense objections, accepted the assertions by JTF-GTMO that there was no monitoring of attorney client meetings in the preceding two years, and decided that there was no need to consider whether meetings in the years prior were monitored.  The court refused to grant an order prohibiting future monitoring because, in its view, such an order would

---

[13] *United States v. Khalid Shaikh Mohammad*, Ruling on Emergency Defense Motion (AE 133QQ), pg. 12 (November 30, 2016), available at: https://assets.documentcloud.org/documents/3868604/Marine-general-s-letter-on-Attorney-Client.pdf (last viewed October 23, 2017).

constitute judicial overreach and an advisory opinion.  The military judge concluded: "The JTF Commander and his subordinates have a preexisting legal duty not to monitor attorney-client communications, and issuing an order requiring them to execute their duties would be superfluous."[14]

(7)     The Organization for Security and Cooperation in Europe (OSCE)[15] conducted an assessment of conditions of detainees at Guantanamo in August 2015 at which time they received assurances that there "are currently no listening devices in rooms used for attorney-client meetings [and] that private conversations between counsel and their client in the courtroom remain private and are not recorded, transmitted, or shared with anyone outside the privileged attorney-client relationship."[16]

(8)     In November 2016, in response to defense claims of eavesdropping upon attorney client conversations in the holding cell associated with the court and the interview room, the military judge issued an order directing that lawyers be briefed on the eavesdropping and recording capabilities of the "smoke detectors" in the interview rooms and that, if the government planned to monitor attorney client meetings, they were to provide advance warning.[17]

---

[14] *United States v. Nashiri*, AE 149K, "Order – Defense Motion for Appropriate Relief:  Determine the Extent of Past Monitoring at Camp Echo II and Order that No Future Monitoring Occur in JTF-GTMO Facilities", August 5, 2013, pg. 4.

[15] The OSCE addresses a wide range of security-related concerns, including arms control, confidence and security-building measures, human rights, national minorities, democratization, policing strategies, counter-terrorism and economic and environmental activities. See, http://www.osce.org/whatistheosce (last visited October 24, 2017).  The United States is a participating nation state. Id.

[16] OSCE Human Rights Situation of Detainees at Guantanamo (November 2015), para. 402, citing US comments to the draft report that were submitted on August 6, 2015. Id. at par. 96.

[17] *United States v. Khalid Shaikh Mohammad*, Ruling on Emergency Defense Motion (AE 133QQ), pg. 16-17 (November 30, 2016), available at: https://assets.documentcloud.org/documents/3868604/Marine-general-s-letter-on-Attorney-Client.pdf (last viewed October 23, 2017).

a.     On June 14, 2017, Brig. Gen. Baker issued a memorandum advising defense counsel, including Mr. Kammen, that he had recently received information indicating ongoing improper monitoring of meetings between detainees and their lawyers.  This unlawful monitoring was said to have occurred between September 2015 and April 2017.[18]  He cautioned counsel to "not conduct any attorney-client meetings at Guantanamo Bay, Cuba until they know with certainty that improper monitoring of such meetings is not occurring":

> At present, I am not confident that the prohibition on improper monitoring of attorney-client meetings a GTMO as ordered by the commission is being followed.  My loss of confidence *extends to all potential attorney-client meeting locations at GTMO*.  Consequently, I have found it necessary as part of my supervisory responsibilities under 9-1a.2 and 9-1a.9 of the Regulations for Trial by Military Commission to make the above-described recommendations to all MCDO defense counsel.  Whether, and to what extent, defense teams follow this advice is up to the individual defense team.[19]

[Emphasis added].

b.     After that memorandum, the Prosecution assured the defense and the Commission that the issue of concern did not affect the space where Mr. Kammen meets with his client.  Although the litigation over this assurance is classified by the government, Mr. Kammen is allowed to publically say that those assurances were completely contradicted.

---

[18] Latest attorney-client privacy issue at Guantanamo is called "unintentional", Miami Herald, July 2, 2017. See:  http://www.miamiherald.com/news/nation-world/world/americas/guantanamo/article159333239.html (last visited October 24, 2017).
[19] https://assets.documentcloud.org/documents/3868604/Marine-general-s-letter-on-Attorney-Client.pdf (last viewed October 23, 2017).

c.     Mr. Al-Nashiri has been detained for the past fifteen (15) years.  He has no

contact with the outside world except for his attorneys, periodic monitored telephone

conversations with his family, and meetings with the Red Cross. Thus, it cannot be that

the United States is monitoring privileged attorney client communications in order to

seek new information in its "war on terror".  What is more likely, is that they seek

information about defense strategies concerning Mr. Al-Nashiri's treatment since he has

been in United States custody.  "Unclassified documents show [Mr. Al-Nashiiri] was

waterboarded, abused rectally, confined to a coffin-sized box and subjected to other

'enhanced interrogation techniques' to break him in interrogation."[20]  It has also been

reported that "[h]e also was kenneled like a dog in a cage and hung nude by his arms to

the point where a medical officer worried his arms would be dislocated.  Other

techniques used on him included a CIA officer revving a cordless drill [near] Mr. Al-

Nashiri's head while he was blindfolded, cocking a pistol near his head, threatening to

sexually abuse his mother, and according to a 2016 account by one of his interrogators,

using a 'stiff bristled brush to scrub his ass and balls and then his mouth and blowing

cigar smoke in his face until he became nauseous."[21]   Monitoring to obtain a procedural

advantage in litigation strikes at the core of due process, the right to a fair trial, the

attorney client relationship and privileges, and the right to counsel enshrined in the Sixth

Amendment.

## GROUNDS FOR RELIEF

---

[20] *Guantanamo's USS Cole death-penalty case in limbo after key defense lawyer quits*, Miami Herald,
October 13, 2017; http://www.miamiherald.com/news/nation-
world/world/americas/guantanamo/article178691836.html (last viewed October 23, 2017).
[21] *USS Cole bombing trial guide*, Miami Herald, September 5, 2016; See:
http://www.miamiherald.com/news/nation-world/world/americas/guantanamo/article100104397.html (last
visited October 24, 2017).

### Ground I
### Col. Spath Lacks Authority to Order the Appearance of Petitioner as Counsel

34. Petitioner incorporates by reference paragraphs 1-33, *supra*.

35. Col. Spath had no authority to issue the October 16, 2017 Order directing Mr. Kammen to appear as counsel for Mr. Al-Nashiri nor the November 1, 2017 Order directing the same.

36. The authority to detail and appoint defense counsel belongs only to the Chief Defense Counsel. Congress tasked the Secretary of Defense with prescribing regulations for detailing and appointing military commission defense counsel. 10 U.S.C. §§ 948k(a)(4) and (c)(2). The regulations promulgated vested the sole authority in Chief Defense Counsel. R.M.C. 501(b); Regulation for Trial by Military Commission ("R.T.M.C.") 9-1.a.4. Rule 501(b) of the R.M.C. states unequivocally "Military trial and defense counsel shall be detailed to military commissions by the Chief Prosecutor and Chief Defense counsel, respectively."

37. Believing his continued representation of Mr. Al-Nashiri a violation of ethical rules, Mr. Kammen had an ethical and legal obligation to discontinue representation of Mr. Al-Nashiri. "The lawyer–client privilege rests on the need for the advocate and counselor to know all that relates to the client[] . . . if the professional mission is to be carried out." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980)); see also *id*. (stating that "legal assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure") (citation and internal quotation marks omitted).  If a client is unable to give his lawyer information "free from the consequences or the apprehension of disclosure," then his lawyer's "need . . . to know all that relates to the

24

client[]" is unfulfilled and the lawyer cannot "carr[y] out" the professional mission of providing effective representation, which is a defendant's constitutional right. *Id.*; *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

38. Under this legal and ethical obligation, Mr. Kammen appropriately moved the Chief Defense Counsel for permission to withdraw for good cause and permission was granted. Mr. Kammen filed his written notice of excusal and at that time his status changed in the current proceedings from learned counsel to a private American citizen.

39. Nowhere in the Rules is there a provision allowing the reversal of Chief Defense Counsel's decision to find good cause or excuse counsel. Once excused, counsel's participation in the commission is terminated.

40. In his order denying the motion to abate, Col. Spath contends that he retains control over whether Mr. Kammen may properly be released from Mr. Al-Nashiri's case. In Col. Spath's view, ambiguity exists in the law regarding who determines whether good cause has been shown on the record and that where the ambiguity exists, the excusal must be accomplished by a military judge on the record. The problem with this logic is that there simply is no ambiguity.  The language relied upon by Col. Spath has been deleted from the R.M.C.

41. Col. Spath relies upon the language in the original 2007 Rules for Military Commission (RMC), which in discussing the accused's rights to counsel in Rule 506 stated:

> (b) Excusal or withdrawal. Except as otherwise provided in R.M.C. 505(d)(2), defense counsel may be excused only with the express consent of the accused, or by the military judge upon application for withdrawal by the defense counsel for good cause shown.

42. The current version of the code has deleted that provision in its entirety, leaving only section 505(d)(2) to govern the excusal of defense counsel which states:

> (B) After formation of the attorney client relationship. After an attorney-client relationship has been formed between the accused and detailed defense counsel or associate or assistant defense counsel, an authority competent to detail such counsel may excuse or change such counsel only:
>
>> (i) Upon request of the accused or application for withdrawal by such counsel under R.M.C. 506(b); or
>>
>> (ii) For other good cause shown on the record.

43. Col. Spath was without authority to nullify General Baker's excusal of Mr. Kammen. Therefore, Col. Spath lacks any authority to order Mr. Kammen's appearance as counsel.

44. Moreover, Mr. Kammen could not obey the order to appear as counsel without violating Indiana's Rules of Professional Conduct and his client's rights, rendering the order of contempt unlawful.  See *Turner v. Rogers*, 564 U.S. 431, 442 (2011); *United States v. Wendy*, 575 F.2d 1025, 1030-31 (2d Cir. 1978) (reversing trial judge's contempt citation against a lawyer for refusing to follow the judge's order to represent a defendant, where the lawyer correctly determined he was unqualified to provide representation).

45. Petitioner has requested a hearing and is urging the Court to review both the unclassified *and the classified information* which forms the basis for the ethical conundrum.  Upon doing so, Petitioner is confident the Court will agree with General Baker and the civilian counsel that Mr. Kammen's excusal from these proceedings was mandated.

46. Custody of Mr. Kammen and any detention for failure to obey an unlawful order violates his right to due process under the Fifth Amendment of the Constitution.

### Ground II
### Col. Spath lacked Authority to Issue the Contempt Order & Detain
### a United States Citizen in Military Custody

47. Col. Spath is without authority to issue a contempt order and detain a United States citizen.

48. A military commission is not a "court." It is an Article I tribunal, akin to an administrative agency board, that operates under tightly constrained powers and may not act outside of the powers explicitly given it by statute. Col. Spath's position and commission operate under the auspices of 10 U.S.C. §§ 948-950 (the Military Commissions Act or MCA).

49. The MCA was drafted in 2006 to authorize trial by military commission for violations of the law of war. It is not a part of the Uniform Code of Military Justice found at 10 U.S.C. §§ 801-946a. The Uniform Code of Military Justice (UCMJ) is the foundation of military law and governs the conduct of the armed forces.

50. The jurisdiction of a military commission is penal. Persons subject to the military commission's jurisdiction are "any unprivileged enemy belligerents," 10 U.S.C. § 948(c). Mr. Kammen is not subject to the jurisdiction of the MCA commission.

51. Refusing to obey an order of the MCA commission cannot form the basis of contempt.

52. In 2009, the contempt provision of the UCMJ, 10 U.S.C. § 848, was carried over, nearly verbatim, to form the contempt provision of the MCA, 10 U.S.C. § 950t(31). In 2009, the contempt provision of the UCMJ contained two possibilities for a finding of

27

contempt, 1) use of any menacing word, sign, or gesture, in the court's presence, or 2) disturbing the proceedings by any riot or disorder.

53. In 2011, the contempt provision of the UCMJ was amended to add a third category of contempt, the third category expanded the definition to include, 3) willfully disobeying the lawful writ, process, order, rule, decree, or command of the court-martial court, or military commission.

54. This third provision was added in 2011 to §848 of the UCMJ but was never added to §950t(31) of the MCA. In fact, when the provision was added to the UCMJ, a subsection (c) was also added which provides specifically that ""This section does not apply to a military commission established under chapter 47A of this title," (i.e. the military commissions in Guantanamo).

55. Col. Spath has no jurisdiction to hold Mr. Kammen in contempt. Additionally, were he to have jurisdiction over Mr. Kammen, he has no authority under the MCA to hold Mr. Kammen in contempt for failure to comply with an order of the commission.

56. Under the MCA, the commission may hold in contempt and punish "any person who uses any menacing word, sign, or gesture in its presence, or who disturbs its proceedings by any riot or disorder." 10 U.S.C. § 950(t)(31).

57. The relevant clause is "disturb[ed] proceedings by any riot or disorder." Excused as counsel, Mr. Kammen's failure to appear does not constitute a "disorder" as that term is strictly construed.

58. Though the word "disorder" has not clearly been defined, a heated exchange between a lawyer and a military judge does not constitute a "disorder." *United States v.*

*Burnett*, 27 M.J. 99 (1988)[22]. Critically, neither does frustrating an order from a military judge. *United States v. Scaff*, 29 M.J. 60, 66 (C.M.A. 1989) (refusing to find contempt where "the convening authority negated a ruling of the military judge by declining to provide funds necessary to implement it.").

59.   The contempt power has never been construed to cover the disobedience of an order much less the disobedience of an illegal order.

60. Taken together, the lack of proper jurisdiction, Congress' unwillingness to extend contempt under the CMA to defiance of a judicial order, and the longstanding interpretation of the word "disorder," demonstrates that Col. Spath has no lawful authority to hold Mr. Kammen in contempt for refusal to comply with an order, irrespective of that order's legality.

61.   In being lawfully excused from continuing representation of Mr. Al-Nashiri, Mr. Kammen is neither engaging in riot nor disorder, nor is he disturbing ongoing proceedings. Having been excused for good cause over ethical concerns, Mr. Kammen has no status in the current proceedings, he is simply a private American citizen.

62. 18 U.S.C. § 4001(a) (the Non-Detention Act) states that "No citizen shall be imprisoned or otherwise detained except pursuant to an Act of Congress." The MCA

---

[22] This case adopts the narrow construction recommended by the leading military law treatise, "Winthrop, Military Law and Precedents. Winthrop determined that "disorder" should be read in conjunction with the word "riot" and would only reach: assaults committed upon members, or upon persons connected with the court or properly before it; altercations between counsel or spectators; drunken or indecent conduct; loud and continued conversation; any noise or confusion which prevents the court from hearing the testimony, and any shouting, cheering, or other expression of applause or disapprobation, especially if repeated after being checked; contumelious or otherwise disrespectful language, addressed to the court or a member or the judge advocate, of so intemperate a character as to derange the proceedings, especially if persisted in after a warning from the court.

W. Winthrop, Military Law and Precedents 309 (2d ed. 1920).

cannot form the statutory predicate to satisfy the Non-Detention Act's requirement because its stated purpose is to try "alien unprivileged enemy belligerents." 10 U.S.C. § 948(b)(a). Respondents do not and cannot dispute Mr. Kammen's status as an American citizen.

### Ground III
### Unlawful Seizure

63.   Petitioner incorporates by reference paragraphs 1-27, supra.

64. The Fourth Amendment to the United States Constitution states that citizens are to be secure against "unreasonable searches and seizures." U.S. Const. Amend IV. Mr. Kammen has been unreasonably seized by an Article I tribunal that has improperly reached outside its proceedings. Col. Spath has done so without explicit statutory authorization, rendering his seizure, custody and any detention unlawful.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Petitioner Richard Kammen asks this honorable court to:

1.   Hold an evidentiary hearing that would include an examination of all the relevant evidence, both classified and unclassified.  At the conclusion of the hearing, issue a writ of *habeas corpus* ordering that Mr. Kammen be released from Col. Spath's unlawful order to appear as counsel and released from any detention;

2.   Issue a declaration specifying that a military commission tribunal cannot hold Mr. Kammen, a United States citizen, without explicit statutory authorization and declaring that any further orders purporting to compel Mr. Kammen to render legal services at any location are illegal and null and void.

4.   Order other such relief as this Court deems proper and just.

Dated:  November 2, 2017

Respectfully submitted,

Richard Kammen, Petitioner

By and through his counsel:

/s/ *Jessie A. Cook*
JESSIE A. COOK
Law Office of Jessie A. Cook
400 Wabash Avenue #212
Terre Haute, IN 47807
(812) 232-4634
jessieacook@icloud.com

/s/ *Robert W. Hammerle*
ROBERT W. HAMMERLE
Pence Hensel, LLC
135 North Pennsylvania #1600
Indianapolis, IN 46204
(317) 643-6960
rhammerle@pencehensel.com

## CERTIFICATE OF SERVICE

I certify a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the parties of record by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.  Col. Vance Spath, Military Judge, was served via email at martin.l.sims.civ@mail.mil because on information and belief there is no mail service in Guantanamo Bay, Cuba.

The following parties have been served via United States Mail with first class postage affixed:

General James Mattis
Secretary of Defense
United States Department of Defense
1000 Defense Pentagon
Washington DC  20301

Harvey Rishikof, Convening Authority
Department of Defense
Office of Military Commissions
4800 Mark Center Dr.,  Suite 11F09-02
Alexandria, VA  22350

/s/ *Jessie A. Cook*
JESSIE A. COOK